# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                          Case No.:

20    0879

| | |
|---|---|
| Nicole D. | ) |
| Brian G. | ) |
|    Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Allergan, Inc., | ) |
| | ) |
| Allergan USA, Inc., | ) |
| | ) |
| Allergan, PLC, | ) |
| | ) |
| Allergan Sales, LLC, | ) |
|    Defendants, | ) |
| | ) |

COMPLAINT

Introduction

On July 24, 2019, at the FDA's instruction, Allergan announced it was issuing a
worldwide recall of all BIOCELL textured breast implants. The FDA instruction came after
numerous reports evidencing that BIOCELL implants were associated with hundreds of cases of
a rare form of lymphoma called breast-implant-associated anaplastic large-cell lymphoma
("BIA-ALCL").  Allergan's original label filed with the FDA in 2013 did not properly disclose
the risks associated with lymphoma.  While Allergan obtained FDA approval to manufacture and
sell the implants in 2013, the approval was contingent upon proper labelling, and an ongoing
obligation to supply information to the FDA as it was learned.  One of the specific conditions of
approval was that Allergan was subject to ongoing federal obligations to report "material adverse
events" associated with the implants to the FDA.  But, after gaining its contingency approval,
when Allergan learned of the increased risks of lymphoma associated with the implants, it failed
to properly inform the FDA, as required.   Reporting adverse events to the FDA would have
caused the adverse events to have become known by the public. Reporting to the SEC would
have had the same effect; and Allergan failed to properly report the required adverse information
to both the FDA and SEC. Because Allergan did not properly fulfill its reporting duties to the
FDA and the SEC, the public, including plaintiffs Nicole and her husband, did not learn about
the adverse events that were being discovered and reported by Allergan until a later time than
should have been. Because of this failure of information, Nicole continued living with the

implanted devices more than should have been, subjecting her, and potential future children, to ongoing potential lymphoma exposure.  Only upon the recall, instructed by the FDA, did Nicole and her husband learn of the potential lymphoma exposure.  Thereafter, Nicole suffered emotional distress, and to avoid further exposure and distress, decided to have the implants surgically removed.   After surgical removal, but before bringing this suit, Plaintiff Nicole and Brian sent a demand letter under Massachusetts G.L. c. 93A to all of the above Allergan entities ("Allergan" herein) seeking remedial relief, and a response per the statute was not provided.  In this suit, Plaintiff Nicole seeks relief under G.L. c. 93A of the Massachusetts General laws for violating the federal laws and regulations, of which in turn, constitute unfair and deceptive practices under G.L. c. 93A.

## The Parties

1. Plaintiff Nicole D. is an individual who resides with her husband, Brian, in Sharon, Norfolk County, Massachusetts.

2. Plaintiff Brian G. is an individual who resides with his wife, Nicole, in Sharon, Norfolk County, Massachusetts.

3. Allergan, Inc. is a wholly owned subsidiary of Allergan PLC and is incorporated under the laws of Delaware, with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

4. Allergan USA, Inc. is a wholly owned subsidiary of Allergan PLC and is incorporated under the laws of the State of Delaware, with a principal place of business at 5 Giralda Farms, Madison, New Jersey 07940, and has a resident agent in Boston, Massachusetts.

5. Allergan PLC is a publicly traded corporation headquartered in Dublin, Ireland, with its headquarter at 5 Giralda Farms, Madison, New Jersey 07940.

6. Allergan Sales LLC has its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940, and has a resident agent in Boston, Massachusetts.

## Jurisdiction

7. This Court has jurisdiction under both the Massachusetts Long Arm Statute, and the Fourth Amendment to the U.S. Constitution, as the Allergan entities have sufficient jurisdictional contacts with Massachusetts.

8. Allergan Sales LLC holds itself out in its annual report filed in Massachusetts as rendering the following service:  the "manufacture, sale and distribution of eye care and specialty pharmaceutical products" and has as its registered agent, CT Corporation System at 155 Federal St. Suite 700, Boston, MA  02110; and Allergan

USA, Inc. describes the business of its corporation in Massachusetts as "Mfg. Sales & Dist. Eye Care & Spec. Pharmaceutical" with the same resident agent in Boston, MA.

9. Allergan also promotes itself utilizing the internet and national media and by circulating national brochures, including those filed with the FDA, and it raises capital by making filings at the SEC.

10. Allergan sells, markets, and/or distributes its pharmaceutical products in Massachusetts through Allergan Sales LLC and Allergan USA, Inc.

11. Allergan originally sold, marketed and distributed its breast implants to Nicole through Dr. Joseph Russo, 575 Boylston St., #2 Newton Ctr., MA 02459.

12. Allergan used Dr. Russo as a conduit and agent, and offered a warranty program to Nicole through Dr. Russo, whereby Allergan referenced Nicole's name as the offeree of the warranty; Allergan authorized replacement implants through Dr. Russo.

13. As part of a breast implant replacement process, Allergan attempted to obtain representations from Nicole for purposes of minimizing its legal liability.

14. As part of a breast implant replacement process, Allergan, by utilizing Dr. Russo as a conduit, sought Nicole's authorization to receive her "protected health care information."

15. During November 2019, Allergan sought Nicole's signature on a document entitled "BIOCELL Replacement Warranty Informed Consent and Release," where among other things, Nicole was asked to make one or more representations.

16. Nicole and her husband reside in Sharon, Norfolk County, Massachusetts.

17. Nicole obtained the Allergan breast implants from Dr. Russo in Massachusetts, and underwent both her original and her replacement surgery in Newton Centre, Massachusetts.

18. At all times relevant, Allergan communicated with Nicole through Dr. Russo in Massachusetts.

19. Dr. Russo acted as an agent on behalf of Allergan in Massachusetts.

## Venue

20. This court has venue because Nicole and Brian reside in Norfolk County, Massachusetts.

The Facts

The Allergan Implants Contained Non-Disclosed,
Increased, Potential Linkages to Lymphoma

21.     On or about September, 2014 Nicole had breast implant surgery, having
Allergan's BIOCELL textured breast implants implanted.

22.     The exact product that Nicole had implanted was Natrelle 410 Highly Cohesive
Anatomically Shaped Silicone-Filled Breast Implants, Serial Nos. 18731550 and
19271439, with Reference Number FF-410475 ("the product" or "BIOCELL implants").

23.     Since 2013, and at the time that Nicole had the BIOCELL silicone implants
implanted, Allergan had a brochure on file at the FDC, as required by FDA law.

24.     At the time that Nicole had the silicone implants implanted, the risk factors'
section in Allergan's brochure filed with the FDA in 2013 called "Possible Adverse
Events" did not include lymphoma within its three pages of possible adverse events.

25.     Allergan's 2013 brochure filed with the FDA contains a section called "Other
Reported Complications," and within such, the "Cancer" section states that patients with
breast implants are not at a greater risk than those without breast implants, for developing
breast cancer.

26.     Allergan's 2013 brochure filed with the FDA states in part that "...a large follow
up study reported no evidence of an association between breast implants and cancer, and
even showed a decreased incidence of breast cancer compared to the general population."

27. On February 20, 2013, and based upon the information that the FDA had at the time, the
FDA gave pre-market approval for Allergan to manufacture and sell BIOCELL silicone
breast implants.

28. When the FDA gave pre-market approval to Allergan February 2013, it also imposed
future conditions on Allergan.

29. One condition-subsequent following pre-market approval was that Allergan was required
to report adverse events for its implants no later than 30 calendar days after the day that
Allergan received, or otherwise became aware, of certain adverse information.

30. One condition-subsequent, following pre-market approval, was that Allergan had an
obligation to supplement its brochure and label information as it learned information of
which the public should become aware.

31. Following its 2013 pre-market approval letter, Allergan became aware of material
adverse events, including more links between use of Allergan implants and lymphoma.

4

32. After pre-market approval, and upon learning of more links between the use of Allergan breast implants and lymphoma, Allergan did not supplement its brochure on file, and did not disclose greater risks that it learned about.

33. After pre-market approval, Allergan did not report material adverse information on a timely basis to the FDA.

34. Allergan did not properly report material adverse information about its breast implants in its SEC filings for the years 2013, 2014, 2015, 2016, 2017, and 2018.

35. In its annual reports filed at the SEC, Allergan downplayed the linkages of its breast implants to lymphoma, attributing lymphoma linkages to its competitors' breast implants.

36. Upon Allergan learning of potential links between its textured breast implants and potential links to lymphoma, Allergan failed to report material adverse information in a format that would have alerted the FDA that a more probable link existed between using its implants and lymphoma.

37. Upon Allergan learning of potential links between its textured breast implants and potential links to lymphoma, Allergan failed to report material adverse information in a format that would have alerted SEC investors that a more probable link existed between using its implants and lymphoma.

38. Upon Allergan learning of a greater probability of potential links between its textured breast implants and potential links to lymphoma, Allergan "summarized the data" it received and reported, and by doing so, effectively camouflaged the negative information that it should have highlighted.

39. By failing to properly disclose material adverse events, effectively concealing adverse information from the public, Allergan violated both the federal FDA and the Securities laws.

40. By making representations in its annual reports filed with the SEC, Allergan violated the FDA law and also the federal securities laws in failing to report the extent of BIA-ALCL linked to its products on a worldwide basis.

41. By failing to properly disclose what it knew in violation of the FDA law, Allergan caused a delay in the FDA's request for Allergan to recall its breast implants.

42. By failing to timely disclose the increased risks of Allergan's breast implants' possible link to lymphoma, the risks did not become public as soon as they should have.

43. Allergan caused Nicole a delay in the receipt of information as to the more serious risks of its breast implants, causing Nicole to sustain unknown and prolonged exposure to lymphoma that Allergan's original label and brochure did not disclose.

44. By violating the FDA and Securities laws, Allergan caused a delay in the FDA's request for a recall and caused Nicole a delay in the receipt of information as to the more serious risks of the implants, causing exposure of Nicole to risks of lymphoma that Allergan's original label and brochure did not disclose.

45. The violations of federal FDA and Securities law described above, are unfair practices under Massachusetts state law.

46. The violations of federal FDA and Securities law described above, are deceptive practices under Massachusetts state law.

47. On or about July 24, 2019, the FDA requested and/or instructed Allergan to recall various breast implants.

48. Given the FDA's request for instruction, on or about July 24, 2019, Allergan recalled its BIOCELL breast implants that were potentially linked to lymphoma.

49. Nicole and Brian had just gotten married on June 18, 2019 and were planning on having children, when they heard about Allergan's July 24, 2019 recall, and the potential linkage of lymphoma to the implants that were implanted within Nicole.

50. Continuing with the dangerous BIOCELL implants inside Nicole's body, exposing both Nicole and any future children to potential toxicity and/or lymphoma cancer, was something that occupied Nicole's mind, and caused stress, for many hours a week following the recall.

51. Continuing with the dangerous BIOCELL implants inside her body, exposing both Nicole and any future children to potential toxicity and/or lymphoma cancer, was something that occupied Brian's mind, and caused stress, for many hours a week following the recall.

52. Not wanting to further subject Nicole, nor any future children to the potential risks that were revealed at the time of recall, Nicole and Brian decided that Nicole would have the BIOCELL implants removed as soon as could be done.

53. About three months after the recall, on November 7, 2019, Nicole underwent surgery to have the BIOCELL implants removed.

54. Nicole's BIOCELL implants were removed and replaced with an alternative breast implant product deemed to be safe.

55. According to medical research, it takes 8 to 10 years, on average, for symptoms of lymphoma to appear from the implantation of BIOCELL silicone breast implants.

56. Because it takes on average up to 8 to 10 years for symptoms of lymphoma to appear after breast implantation, and due to the prolonged exposure to the product and its effects given Allergan's faulty reporting, Nicole does not know whether the duration and degree of her exposure will eventually result in lymphoma.

57. The acts and failures to act of Allergan in its violation of both FDA and Securities law, were knowing and willful, and caused plaintiff and persons like her to suffer prolonged exposure to a product that should and would have been effectively recalled by the FDA earlier than was done, especially given that its agents knew about the number of lymphoma cases that were linked to Allergan's BIOCELL implants.

58. Nicole and Brian had to pay for the breast implant removal and replacement surgery out of their own monies, because Allergan announced at the time of the recall that it would not pay for surgery to remove the product.

59. Upon removal and replacement surgery for the breast implants, Allergan provided substitute breast implants, but no monies for surgery, nor monies for emotional distress, pain or suffering, nor future medical monitoring.

60. The substitute product that was made available by Allergan at no cost to Nicole was not the textured product that was removed: it was Natrelle Inspira SoftTouch Breast Implants, Serial Nos. 24176630 and 24176625, Reference No. SSF-450.

61. After replacement surgery, Nicole ended up with a product that she did not originally choose, but took only as a replacement to rid the lymphoma-causing BIOCELL implants from her body.

The Implants Are a Class III Device
With Pre-Market Approval Subject to Conditions Subsequent

62. Allergan manufactures and sells the BIOCELL textured implants that were previously developed by the McGhan Medical Corporation, a company Allergan acquired in 2006.

63. In 2011, the FDA identified a link between textured implants and BIA-ALCL.

64. After that identified link, numerous data followed, of which Allergan became the recipient.

65. Allergan did not timely report material adverse data that its employees learned about to the FDA.

66. Allergan did not report the material adverse data that Allergan received in a manner such that the date could be seen on the MAUDE data base, as contemplated by FDA regulations.

67. Because the material adverse data was not reported by Allergan in a manner where it could be seen as contemplated by FDA regulations on the MAUDE database, patients who were considering implants and/or patients with implants such as Nicole would not have had the opportunity to learn of it.

68. Because of Allergan's improper reporting per FDA law and its regulations, when Nicole had her breast implant surgery in 2014, she did not know or have proper access to the actual safety risks that were involved, nor what information was available at the time.

69. Nicole did not have all the information available to make an informed decision at the time that the Allergan implants were implanted.

70. Had Nicole known about the true safety risks, she would not have gone forward with the surgical operation, implanting potential lymphoma-causing BIOCELL implants.

71. Had Nicole known about the true safety risks of the BIOCELL breast implants sooner than when she learned, she would have had removed the breast implants implanted earlier than she did, in order to reduce further exposure.

72. Before the original surgery when the implants were implanted, there were a number of health concerns in the 1990s and early 2000's with breast implants, of which Nicole did not know.

73. The FDA had originally placed a moratorium on the sale of silicone-filled breast implants in 1992.

74. The manufacturers McGhan and Mentor had conducted long-term clinical studies for silicone implants.

75. As a consequence of reportings that occurred on or before 2006, the FDA lifted the moratorium on silicone implants in 2006.

76. Following 2006, more information became available about BIA-ALCL, and its link to Allergan's breast implants.

77. Reports and studies linking breast implants to BIA-ALCL began to emerge a few years after the FDA's moratorium was lifted in 2006.

78. In January, 2011, the FDA released a report showing a possible association between breast implants and BIA-ALCL. And at about that time, the FDA reported: "ALCL has been found more frequently in association with breast implants having a textured outer shell rather than a smooth outer shell."

79. At the time of the July 24, 2019 recall, the FDA reported 573 cases of BIA-ALCL nationwide, including 33 deaths.

80. On or about July 24, 2019, after disallowing Allergan's previous practice of filing "alternative summary reports" and insisting on full disclosures, the FDA noted that it had seen a significant increase in known cases of BIA-ALCL, including since the agency's last update earlier in the year, an increase in 116 new cases and 24 deaths.

81. Of the 573 known cases of BIA-ALCL, about 84% were attributed to Allergan products, and of the 33 reported deaths, 12 patients for which the manufacturer is known, were confirmed to have Allergan breast implants.

82. According to the FDA, incurring BIA-ALCL is six times higher with Allergan's textured implants, than with textured implants from other manufacturers.

83. Textured implants, as opposed to ones with smooth outer shells, increase the risk of BIA-ALCL by ten or more times.

84. The FDA recently announced that its studies show what the risk of BIA-ALCL in women with textured implants is, and these studies show that the risks are ten times more than what had been reported previously.

85. Studies in Europe show similar risks of BIA-ALCL in women with textured implants, to those in the United States.

86. Allergan's BIOCELL implant product is a classified as a Class III medical device.

87. Since April 1991, the FDA has required breast implant manufacturers to obtain premarket approval for any silicone gel-filled breast implants through a specific process, which allows the FDA to evaluate the safety and effectiveness of Class III medical devices.

88. Since at least 2011, Allergan has known about the connection between its BIOCELL implants and BIA-ALCL.

89. Despite its knowledge that developed after 2011, Allergan did not take the steps required by the FDA and Securities laws that would have informed the medical community and the public as to the risks involved with its textured breast implants.

90. As part of the FDA's process, a breast implant manufacturer must provide the FDA with a variety of information including known investigations showing whether or not a Class III device is safe and effective, the components and properties of the device, the manufacturing process and methods, and other data relevant for evaluating the safety and effectiveness of the device that the manufacturer knows or should know.

91. **It is a violation of the FDA law to commercially distribute a device that is not in compliance with the FDA process, which includes its post approval reporting conditions.**

92. Because of the high risks of using implanted devices, manufacturers selling implanted devices are under continuing obligations to comply with the medical device reporting requirements.

93. A manufacturer must report to the FDA within 30 calendar days after receiving or becoming aware of information that a device may have caused or contributed to a death or serious injury, or that a device has malfunctioned and the device or similar device

would be likely to cause or contribute to a death or serious injury, if the malfunction were to occur.  See 21 C.F.R. Section 803.50(a).

94. A manufacturer must also provide periodic reports to the FDA including reports in scientific literature and even unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving class III or related devices, known or that reasonably should be known by a manufacturer.

95. After its FDA pre-approval letter, Allergan was required to file adverse event reports with the FDA and timely communicate complete and accurate safety information for breast implants.

96. After its FDA pre-approval letter, Allergan was required to constantly monitor all reasonably available information, study clinical experiences, and run phased trials, of which Allergen did not do.

97. The FDA publishes the adverse event reports it receives in its public database, MAUDE.

98. Instead of accurately reporting the adverse events each time an injury or malfunction occurred, Allergan chose to effectively conceal the injuries or events by characterizing them as routine events that did not require public disclosure.

99. Allergan concealed the material adverse evidence regarding Allergan's breast implants by filing "alternative summary reports" that bypassed the usual and full-disclosure reporting procedure.

100.        By use of reporting and filing "alternative summary reports," Allergan reported hundreds of thousands of adverse events with less detail than should have been reported, and thereby evaded public disclosure.

101.        The manner of reporting by "alternative summary reports" was done to willfully and knowingly avoid full reporting of the potential linkages between Allergan's breast implants and lymphoma, and violated the FDA law as well as the law's purpose of properly informing the public.

102.        Only after the FDA began cracking down on the flawed reporting, was there a dramatic increase in the number of adverse events reported related to Allergan's breast implant injuries.

103.        Recognizing that Allergan was not properly reporting, the FDA cited a "transparency issue" with the reporting that had been taking place, and made it clear that more thorough reporting was required.

104.        Accurate reporting is critical to ensure that the public is properly informed of potential problems with a class III device.

105.        The FDA relies upon adverse event reports to monitor safety.

106.    The general public, including surgeons and physicians, rely upon the reporting process to assess safety concerns.

107.    Researchers rely upon the reporting process in writing articles.

108.    Potential customers and patients, such as Nicole and Brian, rely upon the proper reporting process.

109.    By using alternative summary reports, and avoiding details, Allergan was able to mislead the FDA, the public, surgeons, physicians and potential patients and customers about the true safety risks of implanting the BIOCELL textured implants.

110.    Allergan chose not to report adverse events from its required post-market approval studies that would have suggested the BIOCELL products caused or contributed to deaths or serious bodily injury.

111.    Since the moratorium was lifted in 2006, Allergan received various information showing the connection between its textured implants and BIA-ALCL, and that the risk associated with its BIOCELL implants was significantly greater than with competitor's products.

112.    Allergan failed to comply with the FDA's conditions and violated federal law by failing to accurately and promptly report adverse events and the true risks of its BIOCELL implants, while it continued to sell its BIOCELL implants.

113.    Had Allergan properly complied with its FDA obligations, Nicole would have been able to have made an informed decision earlier than what she did, about whether to have the original surgical implantation operation.

114.    Had Allergan properly complied with its FDA obligations, Nicole would have been able to access the increased risks that were unknown previously, and would have had the BIOCELL textured implants removed from inside her body sooner than what she did.

115.    Nicole learned, later than if federal law was followed by Allergan, what was implanted inside her and of its potential, and only then that she was able to decide upon surgical removal of the potential lymphoma-causing product.

### Allergan Made Many Unauthorized Representations

116.    In order to comply with the FDA law, Allergan made representations about the Natrelle 410 product, and received an FDA pre-approval letter.

117.    Allergan's authorized representations in the public domain are confined to the representations that were set forth in the brochure and materials submitted to the FDA.

11

**118.    Allergan was not authorized by FDA law to make representations in the public domain beyond those pre-authorized representations in the brochure and materials submitted to the FDA.**

119.    Allergan especially was not authorized to make misleading representations.

120.    Misleading representations that were not authorized by FDA law are both violations of the federal (FDA) law, and breaches of express warranties under state law.

121.    For several years in a row following its pre-approval letter, the Allergan entities made unauthorized representations.

122.    In addition to touting the quality of products, Allergan, without authorization, commented—in periodic SEC disclosures, in publicly-available adverse events reports, and in press releases—about the safety of its breast implant products, particularly as related to ALCL.

123.    Allergan improperly minimized attribution of its textured products' linkage to ALCL, relative to other manufacturers; and despite its representations, it knew that its textured products had a linkage to ALCL many more times that of competitors' products.

124.    Allergan's annual reports for the years 2017 and 2018 contained the exact same disclosure that appeared in the Company's previous five annual reports (going back to 2012). It warned:

> From time to time reports related to the quality and safety of breast implant devices are published, including reports that have suggested a possible association between anaplastic large cell lymphoma and breast implants, **as well as negative reports from regulatory authorities in Europe related to a breast implant manufacturer that is not affiliated with the Company**. (emphasis supplied) **(Taken as a whole, this is not a true statement)**

125.    On May 17, 2018, Allergan submitted an adverse event report to the FDA, which is publicly available on MAUDE, reporting a possible association between ALCL and breast implants—including Allergan's own products. The report warns:

> Based on information reported to [FDA] and found in medical literature, a possible association has been identified between breast implants and the rare development of anaplastic large cell lymphoma (alcl), a type of non-hodgkin['s] lymphoma. Women with breast implants may have a very small but increased risk of developing alcl in the fluid or scar capsule adjacent to the implant. Alcl has been reported globally in patients with an implant history **that includes Allergan['s] and other manufacturers' breast implants. (But Allergan knew that that a greater link existed with Allergan's products as opposed to its competitors, especially its textured implants, and did not disclose such).**

126.     In addition to making formal filings with government entities, Allergan also released at least two additional statements in response to media inquiries about ALCL during 2017 and 2018.

127.     Allergan made a response to an *ABC News 7* article titled "Woman who beat cancer once says breast implants caused cancer again," which was published January 30, 2017. The article described two women who received Allergan textured implants and participated in the Company's FDA-required post-approval studies for two years. [As noted in the article, those post-approval clinical studies were scheduled to last for ten years, but, in 2014, Allergan asked to discontinue the studies after just four years—a request that the FDA granted.] Asked to comment on the content of the article, Allergan furnished a statement, which read in part:

> Patient safety is always Allergan's first priority. However rare, Allergan takes [ALCL] seriously. According to the FDA, *BIA-ALCL has been reported in patients with textured breast implants from all manufacturers.* Because of the limited number of confirmed BIA-ALCL case[s] worldwide, the medical community has not been able to establish causality. **(But again, a greater causal link existed with Allergan products).**

128.     On May 29, 2018, Allergan issued a press release titled "Allergan Responds to Media Reports on Breast Implant Associated Anaplastic Cell Lymphoma (BIA-ALCL)," where Allergan stated:

> Allergan manufactures a broad portfolio of breast implants, including those with textured and smooth surfaces. To date, we are not aware of any BIA-ALCL cases that have been found with other Allergan implants in Australia and New Zealand that do not include Biocell. Plastic Surgeons and patients have a variety of reasons for selecting a textured implant, and patients are advised to have a thorough discussion with their plastic surgeon about the risks and benefits of each implant type to make an informed decision.
>
> **The safety profile of Allergan 's smooth and textured breast implants is supported by extensive pre-clinical device testing, more than a decade of U.S. and European clinical experience involving more than 160,000 women, as well as a large number of peer-reviewed and published studies.**

129.     **Allergan was not authorized by the pre-approval process to make the statements above.  By doing such, it was in violation of the FDA law.**

130.     In making such statements, Allergan was in essence stating that its breast implant products were safe.

131.     In making such statements, Allergan failed to tell the whole truth and disclose the true relationship as it knew it on that date between Allergan's products and BIA-ALCL.

132.     In making such statements, Allergan failed to disclose what it knew from studies:

the studies all showed a stronger link between Allergan's products (up to six times greater), with BIA-ALCL, than competitor's products.

133.    Allergan's statements violated FDA law, and were either knowingly false or reckless, and a violation of the U.S. Securities law, Rule 10b-5.

I.

G.L. c. 93A, Unfair or Deceptive Practices

134.    Paragraphs 1 through 133 are re-alleged.

135.    By failing to properly report, Allergan violated the FDA law.

136.    By failing to update or amend its brochure and labelling, Allergan violated the FDA law.

137.    By failing to act on potential safety issues known as signals, Allergan violated the FDA law.

138.    By failing to comply with all conditions subsequent to obtaining preliminary FDA approval, Allergan violated the FDA law.

139.    By distributing and selling when not in compliance with FDA law, Allergan violated the FDA law.

140.    By failing to state facts that made its representations in its annual reports filed at the SEC untrue, Allergan violated the federal Securities laws.

141.    By making unauthorized statements that were untrue, Allergan violated both the FDA law and Securities laws.

142.    Each of Allergan's violations of the federal laws, was an unfair practice under G.L. c. 93A.

143.    Each of Allergan's violations of the federal laws, was a deceptive practice under G.L. c. 93A.

144.    Allergan's violations caused Nicole prolonged exposure to the risks of lymphoma.

145.    Allergan's violations caused Nicole prolonged exposure with consequences of which are latent, but with greater risks of lymphoma than Nicole knew about, was not agreed to by Nicole.

146.    Allergan's violations caused Nicole emotional distress due to the prolonged exposure to lymphoma, that Nicole learned about only after Allergan's recall.

14

147.   Allergan's violations of the federal laws were willful and knowing.

148.   Allergan's willful and knowing violations caused Nicole potential exposure to lymphoma.

149.   Allergan's willful and knowing violations caused Nicole prolonged exposure of which was not necessary, and of which caused, and continues to cause her, to suffer emotional distress.

150.   As a result of Allergan's unfair or deceptive actions and failures of actions, Nicole suffers damages, including emotional distress.

151.   As of result of Allergan's unfair or deceptive actions and failures of actions, Nicole suffered unnecessary physical pain, both before and after replacement surgery.

152.   As of result of Allergan's unfair or deceptive actions and failures of actions, Nicole suffered pain during replacement surgery.

153.   As of result of Allergan's unfair or deceptive actions and failures of actions, Nicole had to incur the surgical costs of replacement surgery to rid the defective implants.

154.   As of result of Allergan's unfair or deceptive actions and failures of actions, Nicole suffered a loss of income.

155.   As a result of Allergan's unfair or deceptive actions and failures of actions, Nicole will be required to undergo ongoing medical monitoring as a matter of safety.

156.   On or about November 19, 2019 counsel for Nicole served a 30 day demand letter on the Allergan entities above pursuant to G.L. c. 93A.

157.   Nicole, herself or through counsel, did not receive a response in accordance with G.L. c. 93A.

158.   After Nicole had sent a G.L. c. 93A demand letter to Allergan, Nicole's doctor, as an agent of Allergan, was trying to unfairly obtain Nicole's signature on an informed consent and release form so as to limit its liability.

159.   During November, 2019, Allergan attempted to unfairly obtain admissions from Nicole so as to limit its liability as part of a replacement warranty.

160.   By trying to obtain a release from Nicole through Nicole's doctor in the manner attempted, Allergan was unfair and/or deceptive, and violated M.G.L. c. 93A.

161.   As of result of Allergan's unfair or deceptive actions and failures of action, Nicole has suffered, and suffers, other damages, including the uncertainty of

15

whether she will suffer from lymphoma, the symptoms of which are latent and may not be discoverable at this time, and the costs of future medical monitorings, and other damages.

WHEREFORE, Nicole prays and requests that his Court find that Allergan violated Chapter 93A, and award proper damages, including interest, treble damages, and attorneys fees.

II.

Breach of Express Warranty

162.    Paragraphs 1 through 161 are re-alleged

163.    Allergan's labelling and brochure on file was not supplemented to reflect the risks that were associated with its BIOCELL breast implants.

164.    Statements made in Allergan's labelling and brochure were false or became false, and Allergan failed to supplement its statements to reflect what it had learned.

165.    Allergan's statements in its annual reports falsely attributed the risks of lymphoma from breast implants to competitor's products, and deflected the risks associated with the breast implants it manufactured and sold.

166.    Because Allergan did not properly supplement its brochure on file with the FDA and its labelling, Allergan's representations in its brochure and labelling were false when it was manufacturing and selling its recalled breast implants, and such was a violation of FDA law.

167.    Allergan made many statements that were unauthorized by the FDA law, and were in violation of both the FDA and Securities laws.

168.    Allergan's statements in its annual reports and materials filed with the SEC were false while it is was manufacturing and selling its BIOCELL breast implants, and Allergan violated SEC law.

169.    Allergan knew that its statements were false when it made such statements.

170.    Allergan's failure to supplement its brochures and labelling, and to properly and timely report for SEC filing purposes, caused Nicole to become informed much later than she should have as to the exposure and risks she was incurring due implanted breast implants.

171.    Allergan's failure to make statements to correct its original statements, allowed for false statements to continue, and for a coverup that prolonged a recall.

172.     Nicole relied upon Allergan's original statements from inception, and throughout the time she learned about a recall.

173.     Nicole's reliance on Allergan's dated statements caused prolonged exposure to the risks of lymphoma that she should not have to been exposed.

174.     Allergan breached its express warranty by allowing the misrepresentations to continue in the public domain, until the FDA acted in 2019, prompting the late recall.

175.     By its breach of express warranty, Allergan caused Nicole to suffer damages.


WHEREFORE, Nicole prays and requests that the Court find that Allergan breached its express warranty, and award any and all damages permitted by law.

III.

Infliction of Emotional Distress

176.     Paragraphs 1 through 175 are re-alleged.

177.     Allergan's failure to comply with the FDA and Securities law, caused Nicole to continue being physically harmed with breast implants that subjected her to higher risks than previously reported, and of greater exposure to potential lymphoma that otherwise represented.

178.     Nicole would not have continued to maintain the breast implants if she had been told the truth about their increased risks of exposure to lymphoma.

179.     Upon learning of her exposure to lymphoma on account of the breast implants that she had, and their recall, Nicole suffered emotional distress.

180.     Upon learning of the recall, Nicole arranged to, and did have, the BIOCELL breast implants removed, during November, 2019.

181.     On account of non-compliance with FDA and Securities law, Nicole experienced emotional distress due to the prolonged and unnecessary and physical exposure of her body, and her future children, to potential lymphoma.


WHEREFORE, Nicole prays and requests that the Court find that Allergan's violation of the FDA and Securities law caused Nicole emotional distress.

IV.

Breach of Implied Warranty

182.    Paragraphs 1 through 181 are re-alleged.

183.    All along Allergan was required to comply with federal law.

184.    The public and Nicole would not expect a product purportedly being manufactured and sold pursuant to federal law to expose its patients to the magnitude of risk understood to be associated with the implantation of the BIOCELL breast implants.

185.    Allergan is in breach of its implied warranty of merchantability that flows from Allergan's representations that it was in compliance with federal law

186.    Allergan's implied warranty was relied upon by Nicole.

187.    Allergan's breach of implied warranty caused Nicole damages, including but not limited to past and future economic damages, emotional distress, and pain and suffering.

WHEREFORE, Nicole prays and requests that the Court find that Allergan violated the federal law, and breached its implied warranty, and award any and all damages permitted by law.

V.

Loss of Consortium

188.    Paragraphs 1 through 187 are re-alleged.

189.    Brian is married to Nicole.

190.    Allergan violated federal law, and also violated state law.

191.    Brian and Nicole's relationship suffered as a consequence of Allergan's actions and failures described in the allegations above.

192.    Brian suffered emotional distress.

193.    Brian suffered from everything that happened as a consequence of Allergen's failure to comply with the federal law, causing Nicole's prolonged exposure to the Allergan BIOCELL implants when the material adverse events and increased risks of lymphoma were known by Allergan, and not properly reported.

194.    Allergan's actions and inactions caused Brian a loss of consortium.

18

WHEREFORE, Brian prays and requests that the Court find that Allergan's failure to comply the federal law, and state law, caused a loss of consortium.

## Request for a Jury Trial

Nicole and Brian hereby make demand for a jury trial on all claims.

Nicole D. and Brian G.,
By Their Attorney,

Date: 9/16/2020

Robert E. Daidone, Esq.
BBO#544438
44 School Street, Suite 700
Boston, MA  02108
(617) 722-9310
daidoner57@msn.com

19